JSb

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 987 | **DATE** | 3/8/2000 |
| **CASE TITLE** | Patricia J. Hussar-Nelson vs. Kenneth S. Apfel, Commissioner of Social Security | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Plaintiff Nelson's motion for summary judgment [17-1] is granted and the defendant Commissioner's motion for summary judgment [18-1] is denied. This matter is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 3-9-00 date docketed | 21 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICIA J. HUSSAR-NELSON ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 99 C 0987 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| KENNETH S. APFEL, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

DOCKETED
MAR 9 - 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Hussar-Nelson ("Nelson") alleges disability due to lower back pain since December 5, 1994. Nelson now seeks judicial review of the final decision of the Social Security Commissioner Kenneth Apfel ("Commissioner") finding that she was not entitled to Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423. This matter is before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, Nelson's motion for summary judgment is GRANTED (#17) and the Commissioner's motion for summary judgment (#18) is DENIED. This matter is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

### A. Nelson's Testimony

Nelson appeared with counsel and testified at a hearing before Administrative Law Judge James E. Seiler ("ALJ") on August 28, 1997. (R. at 26-64). At the time of the hearing, Nelson was a 39-year old married female with two children ages 2 and 5½. (R. at 29-30). Nelson completed

twelve years of education as well as some college courses. (R. at 30). Nelson's past relevant work experience includes waitress, switchboard operator, underwriter clerk, receptionist, and flat sort operator for the United States Post Office. (R. at 30-36, 118). Nelson worked full-time as a flat sort operator between January, 1990 and March, 17, 1991, the date of her back injury. (R. at 33). Nelson's job duties as a flat sort operator included entering zip codes into a computer and lifting, carrying, and emptying bins of mail on to a flat sorter machine. (R. at 31-32).

On March 17, 1991, while pushing three stacks of bins through a narrow opening, Nelson twisted and injured her back. (R. at 38). Nelson returned to work in May, 1991 on light-duty sorting letters. (R. at 41). On October 1, 1991, the Post Office conducted a physical evaluation of Nelson where her back was injured during an isokinetic test. Nelson was hospitalized between October 11, 1991 and October 19, 1991. (R. at 40-41, 165). A few weeks later, Nelson returned to work at a light-duty job while continuing on-going medical treatment. (R. at 42). Nelson continued to work on light-duty until she quit on December 5, 1994 because she felt the required sitting and bending on the job had become unbearable (R. at 34, 42). The workman's compensation Nelson had been receiving from the Post Office since March, 1991 was discontinued after Nelson quit her job because a Post Office evaluation concluded that her condition was due to her pregnancy. (R. at 46).

Nelson claims that she is disabled because prolonged periods of bending and sitting preclude her from performing sustained work. (R. at 34). She can walk for extended periods of time but can only stand for approximately one half hour and sit for forty-five minutes before having to stand up. (R. at 47-48). Nelson wears velcro shoes which she can put on without bending. (R. at 51). Prolonged bending can cause her pain that lasts for days. (R. at 50-51). Nelson seldom shops for groceries and any cooking, laundry, and washing of dishes that she performs is done at a slow and

broken pace. (R. at 45, 54-55). She drives her daughter to and from school daily and attends church regularly. (R. at 45).

Nelson does not take any pain medication at the present time and relies solely on her TENS unit to help alleviate her pain. (R. at 47). Nelson previously took pain medication which helped relieve the pain but affected her personality. Id. She currently does not perform any exercises because they aggravate her pain. (R. at 56-57).

### B. John Hussar's Testimony

At the time of the hearing, John Hussar had been married to Nelson for eighteen years. (R. at 57). Hussar works as a registry clerk at the Post Office. (R. at 57). Hussar testified that Nelson's injury significantly impacted her life. She can no longer bowl, exercise, or do household chores by herself. (R. at 58). He indicated that Nelson spends most of the day standing and walking. (R. at 59). Hussar generally does the family grocery shopping. (R. at 59).

### C. Medical Evidence

#### 1. Medical Evidence Pre-December 5, 1994

Dr. Roman Daczkewycz was Nelson's attending physician between March, 1991 and February, 1995. (R. 144-162). In March 1991, Nelson sought treatment from Dr. Daczkewycz for the back injury she suffered while working at the Post Office. (R. 144). Dr. Daczkewycz reported that Nelson had marked tenderness over the right S1 joint and posterior iliac chest, her lumbosacral motion was good, and that lumbosacral spine X-rays taken at the hospital at the time of the injury were normal. Id. Dr. Daczkewycz recommended that Nelson start physical therapy and return to work in three days but should avoid any bending, straining, or heavy lifting. Id.

From April, 1991 through June, 1991, Nelson's complaints of pain continued despite physical therapy and medication. (R. at 145-146). On June 28, 1991, Artistospan and Marcaine injections into the right sacroiliac joint were performed which improved her symptoms. (R. at 146-147). Dr. Daczkewycz advised Nelson to stop taking her medication and indicated she could return to her regular duties at the Post Office in three weeks. Id.

Nelson's symptoms worsened following isokinetic testing in October 1991 and she was subsequently hospitalized for approximately nine days. (R. at 149, 165). An acute low back syndrome was diagnosed. (R. at 164, 165). Nelson was treated conservatively with bed rest and medication. (R. at 166). On October 4, 1991, Dr. Dackewycz reported that a CT scan of Nelson's lumbar spine revealed a disc bulge at L4-L5. (R. 149). A neurological evaluation on October 17, 1991 revealed no evidence of neurologic damage. (R. 168). The neurologist suggested that Nelson continue with physical therapy, muscle relaxants, and consider using a corset or TENS unit. (R. 169). An MRI revealed narrow appearing thecal sac and spinal canal with no other abnormalities. (R. 166). An EMG was also normal. Id. Nelson was discharged from the hospital on October 19, 1991. (R. 165). On October 29, 1991, Dr. Daczkewycz reported that Nelson could return to light duty work on November 2, 1991 for four hours daily for three weeks and needed intermittent sitting, standing, and walking. (R. 150).

On January 3, 1992, Dr. Dackewycz noted that Nelson was making some progress with physical therapy. (R. at 151). On January 23, 1992, the Worker Rehabilitation Services, Inc. completed a Work Capacity Evaluation Report ("Report"). (R. at 188-91). The Report indicated that Nelson did not have the capability to perform the physical demands of her job as a flat sort operator but her musculoskeletal status should not limit her ability to perform functional activities.

(R. at 188). The Report also noted that Nelson displayed "self limiting behaviors and symptom magnification [which] indicate she was putting forth moderate effort during the Work Capacity Evaluation." Id. The Report further stated that Nelson would require the following restrictions: two-handed maximum/frequent lifting and carrying and two-handed maximum pushing and pulling. Id.

In February 1992, Nelson returned to Dr. Dackewycz for an examination. (R. at 151). He noted considerable tenderness over the S1 joint area which radiated into the right cheek and some tenderness over the right sciatic notch. Id. At that time, Nelson was on a leave of absence from work caring for her baby daughter. Id. On May 21, 1992, Dr. Dackewycz noted that Nelson reported having right side back complaints and had gotten an extension from the Post Office for resting at home until June 9, 1992. (R. 152). By June 18, 1992, Nelson was performing light duty work for four hours per day. (R. at 153). Nelson was advised to continue her exercises and using the TENS unit. Id.

In March 1993, Nelson complained of discomfort and crampy pain in the right lower extremity along the thigh and extending to the leg. (R. 156). Dr. Dackewycz referred Nelson to the pain clinic at Resurrection Hospital for further treatment of her chronic low back syndrome. Id. Between September 1993 and March 1994, Dr. Small treated Nelson at Resurrection Hospital's pain clinic, and Nelson appeared to be tolerating the treatments. (R. 158, 192-200). On June 10, 1994, Nelson told Dr. Dackewycz that medications gave her little relief. (R. 159). By July 29, 1994, Dr. Daczkewycz indicated that Nelson should try to increase her light duty functions by working a six hour day without any lifting over ten pounds. (R. at 159). On August 31, 1994, Nelson called Dr. Daczkewycz's office and reported extreme back pain. (R. 160). At that time, Dr. Daczkewycz

prescribed Tylenol # 3 and suggested Nelson stay off her feet. Id. On September 2, 1994, Dr. Daczkewycz reduced Nelson's work restriction to light duty for four hours a day and referred Nelson to a pain clinic and for a neurological evaluation with Dr. Pupillo. Id.

On October 25, 1994, Dr. Pupillo performed a neurological evaluation. (R. at 201-02). Upon exam, Dr. Pupillo reported Nelson's back was tender at the lumboiliac insertion on the right and that she had some sciatic notch tenderness. (R. at 201). Nelson's straight leg raising was to ninety degrees bilaterally with some localized pain in the right lumbosacral area. Id. Her gait was normal, her sensation was intact, individual muscle strength testing was normal, and muscle stretch reflexes were present and symmetric. (R. 201-02). Dr. Pupillo opined that Nelson appeared to have chronic myofascial pain syndrome. (R. at 202). Dr. Pupillo stated that "[p]atients with myofascial back pain, which is more than six months in duration, unfortunately present a serious problem, since there is no consensus of the best way to treat such individuals, or how to effectively return them to an 8 hour work day." Id. He noted that surgery was definitely not indicated and that with such a syndrome, only time would determine Nelson's ultimate prognosis. Id.

2. **Medical Evidence post-December 5, 1994**

On December 9, 1994, Nelson came to Dr. Daczkewycz's office in tears complaining of generalized aches and pains in her back with some radiation to the right thigh and lower extremity. (R. 161). Nelson informed Dr. Daczkewycz that she ceased work on December 4, 1994 because she was unable to tolerate the four-hour schedule. Id. Dr. Daczkewycz's examination revealed restricted lumbosacral motion and trigger tenderness over the right sacroiliac joint area and sciatic notch. Id. Myofascitis flare-up was diagnosed and further evaluation and treatment at a pain clinic, anti-inflammatories, and physical therapy were prescribed. Id. In January 1995, Nelson informed Dr.

Daczkewycz that she was pregnant and that the Loyola Pain Clinic did not want to see her during her pregnancy. (R. 162). On January 19, 1995, Dr. Daczkewycz noted that there was nothing further he could do for Nelson. On February 28, 1995, she was released from his care. Id.

In April 1995, Nelson began treating with Dr. Guy Rowley. (R. at 218-229). Dr. Rowley referred Nelson to Dr. Daniel Newman. (R. 226). On May 16, 1995, Dr. Newman examined Nelson. (R. 211-212). Dr. Newman indicated that no objective findings exist with respect to Nelson's back except for a small congenital abnormality in the lumbar spine. (R. 211). Dr. Newman noted: "My examination reveals a woman who appears to be in some distress. She has a very restricted range of motion. She has a very flat back with attempt at forward flexion, and she is limited in motion because of the production of pain." Id. Dr. Newman recommended that after Nelson recovered from delivering her baby, she should be sent to a pain clinic to try to get the pain eliminated or learn to live with it. (R. 212).

On September 7, 1995, Nelson gave birth to a baby boy. (R. at 225). Dr. Rowley's November 7, 1995 exam notes indicate that he recommended Nelson start physical therapy and heat treatments. Nelson was then comfortable standing and could bend to touch her knees. Id. During 1996, Nelson continued to complain of back pain. (R. at 221-24).

Dr. Rowley referred Nelson to Dr. Terri Dallas. Dr. Dallas evaluated Nelson on March 26, 1996. (R. 207). Nelson indicated to Dr. Dallas that on a scale from 0 to 10 she rated her pain as a 4. Id. Nelson also stated that her back pain is continuous and exacerbated by standing or sitting too long. Id. Dr. Dallas found SI joint tenderness with a positive Patrick's and positive Wright's sign, L4-5 radiculopathy, and myofascial pain to the gluteus medius and minimus. (R. 209). Dr. Dallas recommended SI joint injection under fluoroscopy to inject both the superior and inferior aspects of

the joint, trigger point injection to the gluteus medius followed by physical therapy which should involve stretching, myofascial release, electrical stimulation, and heat for approximately 2-3 weeks and 2-3 times per week, and possible epidural steroid injections if the pain is still unbearable. Id.

On May 7, 1996, Dr. Rowley completed a disability evaluation concerning Nelson. (R. at 205-06). Dr. Rowley reported that Nelson had chronic lower back pain which sometimes caused her to limp. (R. at 206). Dr. Rowley indicated that Nelson had forty degrees of lumbosacral flexion and ten degrees extension and that Nelson could straight leg raise to eighty degrees on her right and ninety degrees on her left. (R. at 206). Dr. Rowley additionally indicated no sensory loss or abnormal reflexes and that diagnosis testing was essentially normal. (R. at 205).

On May 21, 1996, Dr. Young-Ja Kim completed a Residual Functional Capacity Assessment. (R. 102-108). Dr. Kim found that Nelson had the following exertional limitations: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour workday; and unlimited ability to push and/or pull. (R. 103). Dr. Kim noted that the latest medical records he examined were dated March 1994. (R. 108).

On January, 27, 1997, Dr. Rowley completed a Physical Residual Functional Capacity ("RFC") Questionnaire. (R. at 138-141). Dr. Rowley stated that Nelson has constant right low back, buttock, and leg pain that is aggravated by cold temperatures as well as sitting and standing still. (R. at 138). He indicated that Nelson could sit for twenty to thirty minutes, stand for fifteen minutes, and walk for many city blocks without rest or severe pain. Dr. Rowley opined that during an eight workday, Nelson could sit and stand for less than two hours total and walk at least six hours. (R. at 139). Dr. Rowley further opined that Nelson needed to be able to shift at will from sitting, standing,

or walking. Id. He stated that Nelson needed constant periods of walking during an eight hour workday and could not reach above her head or bend or twist during an eight hour workday. (R. at 140-141). Nelson could occasionally lift up to twenty pounds and could frequently lift less than ten pounds. (R. at 140). She could tolerate moderate work stress and seldom experienced pain severe enough to interfere with attention and concentration. (R. at 139). Dr. Rowley also noted that Nelson was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations he described. (R. 138-139).

## D. The Vocational Expert's Testimony

Tom Grzesik, a Vocational Expert ("VE"), also testified at the hearing (R. at 28, 64-68). The ALJ asked the VE to give his opinion concerning whether jobs existed in the national economy for a hypothetical individual with the same age, education, and job experience as Nelson and who could stand for thirty minutes before needing to sit, sit for forty-five minutes before needing to stand, and lift more than ten pounds. (R. at 65-66). The VE opined that such an individual could perform 3,500 hand packager, 3,000 mechanical assembler, 4,000 telemarketer, and 4,000 electrical assembler jobs in the Chicago region. (R. at 66). These jobs are unskilled and all have a stand/sit option. (R. at 66).

Nelson's counsel then asked the VE whether a hypothetical individual with the same profile as described by the ALJ who also needed to walk while standing for that half an hour could perform the jobs he had listed. (R. at 66). The VE opined that such an individual would not be able to perform the mentioned jobs. (R. at 66). The VE further testified that if a person could not bend or stoop at all, the number of packaging and assembly jobs would be significantly eroded. (R. at 67).

E.  **The ALJ's Decision**

The ALJ found that Nelson complaints of disabling pain incredible and determined that Nelson's back condition precludes sitting for more than thirty minutes before having to stand, standing for more than forty-five minutes before having to sit, and lifting more than ten pounds. (R. 22, 24). The ALJ further held that Nelson is unable to perform her past relevant work, but she is qualified to perform work in other positions. (R. at 23). The ALJ found Nelson able to perform 3,500 hand packer, 3,000 mechanical assembler, 4,000 telemarketer, and 4,000 electrical assembler jobs in the Chicago region. (R. 23). Thus, the ALJ concluded at step 5 that Nelson was not disabled. (R. at 25). Nelson's request for review of the ALJ's decision was denied by the Appeals Council. (R. at 5-6).

## II. DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order:

1. Is the claimant presently unemployed?

2. Is the claimant's impairment severe?

3. Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform her former occupation?

5. Is the claimant unable to perform any other work?

citing 20 C.F.R. § 416.920(a)-(f). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. Young v. Secretary of Health and Human Services, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. Id. The claimant bears the burden of proof at steps 1-4. Id. Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in other work existing in significant numbers in the national economy. Id.

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

Nelson argues that the ALJ's decision is not supported by substantial evidence in the record because the ALJ failed to base his residual functional capacity finding on medical evidence, the ALJ erred in rejecting Nelson's statements about her pain, the ALJ erroneously rejected the treating physicians' opinions, the ALJ ignored objective medical findings, the ALJ failed to make a proper credibility finding, the ALJ erroneously relied on Nelson's daily activities to support his finding that Nelson was not disabled, and the hypothetical directed to the VE failed to account for all of Nelson's limitations. The Court agrees with Nelson that the ALJ's determination at step 5 is not supported by substantial evidence in the record because the ALJ improperly rejected the uncontradicted

medical opinion of Nelson's treating physician that she needed to walk constantly during an eight hour workday.

As the ALJ recognized, a treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2) (stating "We will always give good reasons . . . for the weight we give your treating source's opinion."). In January 1997, Dr. Rowley, Nelson's treating physician since April 1995, opined that Nelson could sit for twenty to thirty minutes, stand for fifteen minutes, and walk for many city blocks without rest or severe pain. Dr. Rowley also opined that during an eight hour workday, Nelson could sit and stand for less than two hours total and walk at least six hours. (R. at 139). Dr. Rowley further stated that Nelson needed to be able to shift at will from sitting, standing, or walking. Id. He also stated that Nelson needed constant periods of walking during an eight hour workday. (R. at 140). Finally, Dr. Rowley concluded that Nelson's physical impairments are reasonably consistent with the symptoms and functional limitations he described. (R. 139). The VE testified that if Nelson had the limitations found by the ALJ and needed to constantly walk around while standing for a half hour, she could not perform the jobs he identified. (R. 66).

The ALJ found Dr. Rowley's opinions internally inconsistent as well as inconsistent with the remainder of the evidence. (R. 16). The ALJ's rationale is insufficient because he failed to build an accurate and logical bridge between the evidence and the result. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). The ALJ made a factual error in reading Dr. Rowley's residual functional capacity questionnaire dated January 27, 1997. Id. at 307 (reversing denial of benefits and remanding for new findings where ALJ's opinion unreliable because it contained serious mistakes

-12-

or omissions on factual matters). Dr. Rowley did not state that Nelson's pain limited her to less than two hours of walking in an eight hour workday, but rather that she could walk at least six hours in an eight hour workday. (R. 16, 17, 139). Thus, Nelson did not testify inconsistently, as the ALJ found, with Dr. Rowley's residual functional capacity finding when she stated that she could walk "from here to eternity." (R. 17). The ALJ also found that Dr. Rowley's determination that Nelson's pain was not so severe as to interfere with her attention and concentration on more than a seldom basis was inconsistent with her inability to sit, stand, or walk for any significant period of time. (R. 16). This finding is unreliable because Nelson could walk for a significant period of time, namely at least six hours in an eight hour workday.

The ALJ further found Nelson's daily activities inconsistent with Dr. Rowley's findings that Nelson could not bend, twist, or lift ten pounds or more on a frequent basis in a work situation. (R. 16). The ALJ's criticism of Dr. Rowley's finding that Nelson could not lift more than ten pounds or more on a frequent basis is illogical given the ALJ's own conclusion that Nelson's impairment precludes her from lifting more than ten pounds. (R. 23). Moreover, the fact that Nelson cooks, washes dishes, folds clothes and cares for her two children is not inconsistent with a finding of disability and most importantly, Dr. Rowley's finding that she needs to constantly walk while standing and be able to sit, stand, and walk at will. Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) (holding ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (stating "[t]he ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity); Smith v. Califano, 637

F.2d 968, 971 (3rd Cir. 1981) (stating "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

Nelson testified that she cooks but does mostly stove top cooking so she does not have to bend to use the oven. (R. 55-56). Although she washes dishes, Nelson does not wash too many at a time and does them in short bursts of usually less than 15 minutes. (R. 55-56). She does laundry in a washing machine and puts clean clothes on hangers but does these activities at a slow pace. Id. Nelson seldom grocery shops. (R. 45). All of the household tasks performed by Nelson allow her to walk around when necessary to relieve her pain. Nelson receives family help with other households tasks and carrying for her children. Her husband picks up the kids' toys, vacuums, and mops. (R. 54). Nelson's brother lives across the alley from her and she frequently visits him with her children. (R. 45, 53). Nelson's daily activities do not undermine Dr. Rowley's opinion regarding her need to walk to alleviate her back pain.

Nelson's testimony and her husband's testimony corroborate Dr. Rowley's finding concerning Nelson's need to walk frequently throughout the day. When Nelson was on light duty at the Post Office she was "sitting and just sorting mail." (R. 34). She testified that, "I couldn't sit that long so I would have to get up and walk around and I had my doctor's sheet saying that I had to get up and walk around." Id. Nelson stated that prolonged sitting as well as bending precluded her from performing substantial gainful activity. Id. Nelson also testified that "[s]itting causes a lot of pain." (R. 37). At the hearing, Nelson testified in regard to walking:

> Q. Okay, Now you're sitting here today, you're sitting forward in your chair, and your legs –
>
> A. I'm trying not to lean on this buttock.

> Q. Okay. What would be a comfortable, more comfortable position for you?
>
> A. Walking around the room.
>
> Q. How about just standing, would that help?
>
> A. It might help but it's not going to help tremendously.
>
> Q. So, if you were at home right now, you'd get up and walk around, is that it?
>
> A. Yes, definitely.
>
> Q. How do you feel right now?
>
> A. Right now I feel awful.

(R. 51). Nelson's husband testified: "She doesn't sit, she sits for short period of time. She basically stands all day and walks. She can walk a lot, she can walk a lot but she doesn't sit." (R. 59).

Moreover, although the ALJ states that Dr. Rowley's indication of mild lower extremity weakness is inconsistent with his "responses indicating disabling limitations," the ALJ fails to specifically explain how a finding of mild lower extremity weakness is inconsistent with Dr. Rowley's finding that Nelson needs to frequently walk. (R. 16).

The ALJ additionally relies on a telephone contact report dated August 8, 1996 in which Dr. Rowley stated that Nelson's back pain had been stable for years, she had some mild tenderness in the sacroiliac area, had received immediate relief from a cortisone injection, and was without any limitation in her ability to ambulate to show an apparent inconsistent with Dr. Rowley's residual functional capacity findings. (R 16, 17). Again, the ALJ does not specifically indicate how Dr. Rowley's August 8, 1996 statements conflict with Dr. Rowley's residual functional capacity findings. Stable means only unchanged, not an improved or normal condition. Nelson's temporary

pain relief from a cortisone injection does not indicate that she can work eight hours a day, five days a week or undermine Dr. Rowley's finding that she needs to frequently walk. Nelson's ability to ambulate without any limitation is also not inconsistent with Dr. Rowley's prior finding that she can walk at least six hours in an eight hour day and Nelson's testimony that she can do substantial walking and walking helps alleviate her pain. Ambulant means "walking about or able to walk about." Steadman's Medical Dictionary 49 (5th ed. 1982).

Finally, the Court is concerned about the ALJ's finding that the lack of significant atrophy since the alleged onset date undermines Nelson's allegations of disabling pain. (R. 21). The Seventh Circuit has repeatedly counseled, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996); Scivally v. Sullivan, 966 F.2d 1070, 1076-77 (7th Cir. 1992). There is no medical evidence in the record to support the ALJ's finding that "symptoms precluding the ability to perform even sedentary work activity for more than two and one-half years in duration would result in some observable and significant atrophy." (R. 21). This finding cannot stand without supporting medical evidence.

On remand, the Social Security Administration should re-examine the evidence and make new findings to support a decision either to grant or deny benefits. The ALJ should pay particular attention to any medical opinions regarding the need to walk frequently.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED. The decision of the Commissioner is reversed and remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C.

§ 405(g) for further proceedings consistent with this opinion. The Clerk is directed to enter final judgment in favor of the Plaintiff and against the Commissioner in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ENTER:

Nan R. Nolan
United States Magistrate Judge

Dated: MAR - 8 2000